ROBERT W. SUTTON, Plaintiff-Appellee, *v.* ILLINOIS CIVIL SERVICE COMMISSION *et al.*, Defendants-Appellants.

Fifth District    No. 80-161

Opinion filed March 2, 1981.

JONES, J., dissenting.

Tyrone C. Fahner, Attorney General, of Chicago (Edward M. Kay, Assistant Attorney General, of counsel), for appellants.

Nehrt, Sachtleben & Fisher, of Chester (Edward J. Fisher and David R. Smith, of counsel), for appellee.

Mr. JUSTICE KARNS delivered the opinion of the court:

The plaintiff, Robert C. Sutton, was employed as activity programs supervisor at the Menard Correctional Center of the Illinois Department of Corrections. On June 1, 1979, Gayle M. Franzen, Director of the Department of Corrections, instituted discharge proceedings against plaintiff. Following a hearing before the Illinois Civil Service Commission (Commission) the hearing officer recommended that plaintiff be discharged. On November 15, 1979, the Commission found that the charges against plaintiff had been proved, that the conduct warranted discharge and plaintiff was thereafter discharged.

Plaintiff filed a complaint for administrative review in the circuit court of Randolph County. The circuit court reversed the decision of the Commission and ordered plaintiff reinstated. The defendants perfected this appeal, and on June 11, 1980, we stayed the order of the trial court.

The plaintiff was charged with conduct unbecoming a State employee in that: "On May 2, 1979, Mr. Sutton approached resident inmate Andrew Englesman (#A-58057) at the Menard Correctional Center and asked inmate Englesman how much it would take (money) to get Warden Greer 'killed off.' Mr. Sutton also discussed with Englesman what location at the facility would be a good area for the above act to take place. This solicitation of an act of violence to be performed by a resident inmate against Warden Greer was admitted to by Mr. Sutton to Polygraph Examiner Dennis J. Smith and Internal Investigator Robert Verges on May 18, 1979."

At the hearing, Englesman testified that he had been at Menard since December 24, 1975. He had been a member of the Royal Kings prison gang which was a branch of the Latin Kings prison gang. When the Royal Kings and the Latin Kings merged, he became a "semi-retired" gang member. He had been a bodyguard to the chief of the Latin Kings. Subsequently he was placed in charge of maintaining gang discipline in the East cell house. Plaintiff was aware of Englesman's gang association. Englesman had been convicted of robbery, armed robbery, and thrice of forgery.

Englesman further testified that he performed his prison duties as a clerk in the recreation department, under plaintiff's supervision. On May 2, 1979, plaintiff entered his office and threw his books down on his desk. He looked into the gym and asked Englesman how much it would cost to

have the warden killed. Plaintiff had been upset for a few days. Englesman testified that at the time he did not know if the plaintiff was serious, although the plaintiff had a straight face. Englesman jokingly responded "a pack of cigarettes." Englesman testified that the plaintiff further commented that Warden Greer "had almost got hit" in the Inter Perimeter Captain's Office and that this would be a good place to commit the killing, to which Englesman agreed. Englesman discussed the situation with another gang member and two days later told authorities of the conversation with plaintiff. Plaintiff did not personally ask Mr. Englesman to kill the warden or to find someone who would nor did he offer Englesman a pack of cigarettes.

Dennis Smith, employee at the Department of Corrections, testified that he interviewed the plaintiff on May 18, 1979. Concerning the incident, plaintiff said that he had been upset by an alleged threat from gang members and by personality or job conflicts with the warden. On the afternoon in question, without thinking, he asked Englesman how much it would cost to get the warden killed. Plaintiff could not recall Englesman's response. Smith testified that the plaintiff indicated that his statement to Englesman had been merely idle conversation.

Plaintiff testified that he had been employed at Menard since 1974. At the time in question, he was upset with the warden because the warden had sent him a memorandum which criticized his job performance. Plaintiff asked Englesman, with whom he had a good working relationship, what it would take to have someone killed. Plaintiff did not remember specifically mentioning Warden Greer's name. Englesman responded that it would take about a pack of cigarettes. Englesman had told plaintiff that some gang members were going to kill plaintiff because of the cessation of the boxing program.

Five witnesses testified that plaintiff's reputation as a peaceful, law-abiding citizen at his place of employment was good. They also testified that plaintiff is well respected and that he does his job well. Plaintiff's job evaluations were placed into evidence. The evaluations showed that plaintiff's supervisors considered that he was meeting or exceeding job expectations.

The hearing officer found that on May 2, 1979, plaintiff asked Englesman what the cost would be to have Warden Greer killed. The hearing officer concluded that it was "entirely possible" that the conversation also included a discussion of where the murder should be carried out. However, the officer found that the statement was by no means a solicitation for murder but a venting of feelings of frustration and anger. The hearing officer observed that if the statement of plaintiff had been mere office banter, only a minimal disciplinary action, if any, would be imposed. However, considering the context of the statement and to

whom it was made, the statement was a monumental error of judgment justifying plaintiff's discharge.

The Commission adopted the findings and rulings of the hearing officer and discharged plaintiff. The trial court found that the Commission's findings were against the manifest weight of the evidence and that one statement made in a time of frustration in an otherwise excellent work record should not be the basis for discharge. On appeal, the Commission contends that the findings of the Commission were not against the manifest weight of the evidence and that plaintiff's statement constituted good cause for discharge.

■■■ Section 11 of the Personnel Code (Ill. Rev. Stat. 1979, ch. 127, par. 63b111) provides that no duly appointed employee shall be discharged except for "cause." Inasmuch as cause is not defined in the statute, whether conduct is sufficient cause for discharge is generally for the Commission to determine. However, unlike findings of fact, agency determinations of cause are not prima facie true and correct and are subject to judicial review. Substantial deference must be given the Commission's ruling on what constitutes cause. (*Department of Mental Health v. Civil Service Com.* (1980), 86 Ill. App. 3d 1072, 408 N.E.2d 775.) However, the Commission's determination may be overturned if based on trivial, arbitrary or unreasonable grounds. (*Fox v. Civil Service Com.* (1978), 66 Ill. App. 3d 381, 383 N.E.2d 1201; *Kreiser v. Police Board* (1976), 40 Ill. App. 3d 436, 352 N.E.2d 389, *aff'd* (1976), 69 Ill. 2d 27, 370 N.E.2d 511.) "Cause" has been defined as some substantial shortcoming which renders continuance in office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and sound public policy recognizes as a good cause for no longer holding the position. (*Fox v. Civil Service Com.; Parkhill v. Civil Service Com.* (1978), 58 Ill. App. 3d 291, 374 N.E.2d 254.) Employment history has a bearing on the issue of cause. (*Kreiser v. Police Board; Fox v. Civil Service Com.*) Thus, cause must properly balance employee's interests in avoiding dismissal not warranted by the facts and the State's interest in maintaining efficiency through the prompt removal of employees who presently contribute to inefficiency because of past conduct. *Fox v. Civil Service Com.*

While the charge here appears to allege that plaintiff actually solicited an act of violence, the hearing officer expressly found that this did not occur. The hearing officer did conclude rather tenuously that a location for the assassination was in fact discussed. However, this aspect of the charge rested entirely on Englesman's testimony, and it was contrary to the plaintiff's testimony that he merely asked what it would take to have someone killed. The hearing officer apparently found the plaintiff credible, noting that he "made a good appearance" and that his

character witnesses uniformly testified that he has a reputation as a law-abiding citizen and that he is well respected and does his job well. In this respect we cannot say that the trial court erred in concluding that the administrative finding was against the manifest weight of the evidence.

■■ Therefore, as the trial court concluded, the propriety of plaintiff's dismissal rests entirely on the fact of his statement in the presence of Englesman, who was employed as the plaintiff's clerk. This statement was no doubt ill-advised. However, we must agree with the trial court that it would be unreasonable to conclude that discharge is warranted by an *isolated statement of an employee with an otherwise good work record* made in a time of anger and frustration. Englesman himself indicated doubts as to plaintiff's seriousness in making the statement. Even accepting the hearing officer's findings, we do not believe that the record reveals conduct so detrimental to the discipline and efficiency of the service as to warrant dismissal.

We have considered the possibility of remanding to the Commission for consideration of whether a sanction other than discharge should be imposed, such as a suspension without pay. (Ill. Rev. Stat. 1979, ch. 127, par. 63b111; see *Kreiser v. Police Board; Department of Mental Health v. Civil Service Com.*) However, the Commission has not requested this remedy, and the plaintiff has already sustained a substantial detriment in being removed from his position during this litigation, including the period pending appeal during which we stayed the trial court's order.

The judgment of the Circuit Court of Randolph County is affirmed.

Affirmed.

HARRISON, J., concurs.

Mr. JUSTICE JONES, dissenting:

In my opinion the order of discharge entered by the Commission is supported by the evidence and inferences, and the applicable law, and should be affirmed. Accordingly, I respectfully dissent.

In its memorandum filed with its order, the trial court stated:

"The Commission itself found that the only thing proved was that the Plaintiff made the statement in front of Inmate Englesman.

The Commission concludes that this was such an error of judgment that it warrants discharge. It appears the Commission has completely ignored not only the context in which it was made, but also the environs in which it was made."

The majority reasoned that the propriety of plaintiff's dismissal rests entirely on the fact that the statement was made in the presence of inmate

Englesman. The statement is termed isolated and ill-advised and held to be an unreasonable basis for discharge of plaintiff.

The trial court and the majority have not plumbed the basis for the Commission's order of discharge. It is true, as recited, that the hearing officer found that the statement was not a solicitation for murder but a venting of frustration and anger. But cursory examination shows that the statement in itself was not the basis for the order. Rather, the true basis was found in a consideration of the context of the statement, where it was made and to whom it was made. So considered, the statement was found to be a monumental error of judgment justifying discharge. With that I must agree.

Inmate Englesman testified that when the statement was made the plaintiff was straight-faced. He, Englesman, made the joking reply. Investigator Smith testified that plaintiff characterized his statement, not as jest, but "idle conversation." An aggravating factor was that plaintiff went beyond the mere making of the statement to a discussion of just where in the prison would be a good place for the warden to be "hit."

Although the colloquy between plaintiff and Englesman might be termed "idle conversation" or "joking," such characterizations would not attend Englesman's relating the story to other prison inmates. As such a story permeates through the prison its consequences become serious indeed. And Englesman testified that he did in fact tell other inmates of the incident. Given the constant volatile and emotion-charged situation present in the prison, the statement and attendant conversation would greatly undermine the authority of the warden and seriously impair efforts to control the prison.

The order of the Commission should be reinstated.